## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>        **Plaintiff,**<br><br>        v.<br><br>**Blake Harrison Kantor aka Bill Gordon,**<br>**Nathan Mullins,**<br>**Blue Bit Banc,**<br>**Blue Bit Analytics, Ltd.,**<br>**G. Thomas Client Services, and**<br>**Mercury Cove, Inc.,**<br><br>        **Defendants,**<br><br>**and**<br><br>**Blue Wolf Sales Consultants,**<br><br>        **Relief Defendant.** | Civil Action No. ___18-cv-2247-SJF-ARL<br><br><br><br>**F I L E D**<br>IN CLERK'S OFFICE<br>U.S. DISTRICT COURT E.D.N.Y.<br>★ APR 16 2018 ★<br>LONG ISLAND OFFICE |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES AND OTHER EQUITABLE RELIEF**

Plaintiff, Commodity Futures Trading Commission ("Commission" or "Plaintiff"), by its attorneys, alleges as follows:

### I.   SUMMARY

1.   The Defendants operated a common enterprise to defraud U.S. customers in connection with a "binary options" scheme.

2.   Beginning in at least April 2014, and continuing through the present ("Relevant Period"), Defendants Blake Harrison Kantor ("Kantor") and Nathan Mullins ("Mullins"),

individually and acting through Defendants Blue Bit Banc ("Blue Bit"), Blue Bit Analytics, Ltd. ("Analytics"), and Mercury Cove, Inc. ("Mercury"), and G. Thomas Client Services ("G. Thomas") (collectively "Defendants") operated and functioned as a common enterprise (the "Blue Bit Enterprise"), engaged in an illegal binary options trading scam using the instrumentalities of interstate commerce and received at least $618,810 from at least 6 U.S. customers, at least some of which was misappropriated.

3.      Defendants have transferred some of the customer funds it received to Relief Defendant Blue Wolf Sales Consultants ("Blue Wolf").  Relief Defendant Blue Wolf does not provide any apparent legitimate services to the Blue Bit Enterprise or its clients and does not have any interest or entitlement to client funds.

4.      The Defendants fraudulently solicited the Blue Bit Enterprise's customers to enter into these illegal, off-exchange binary options transactions.  They did this through phone calls and emails to prospective customers and through their website, www.bluebitbanc.com.  In their solicitations, the Defendants offered their customers self-traded and managed accounts that they falsely claimed would generate significant profits based upon Kantor's purported past profitable trading.

5.      In late 2017, Kantor told some of the customers that Blue Bit was terminating its binary options business and that customers would have to close their accounts.  However, in an attempt to cover up the fraud, Kantor invited these customers to transfer their balances to a new virtual currency firm with which he had become affiliated, Bitsblockchain, where they would receive an amount of a new virtual currency, ATM Coin ("ATMC").  As an incentive, Kantor said that the U.S. dollar equivalent of ATMC which they would receive would be substantially more than their Blue Bit account balance.

2

6.     Some Blue Bit customers agreed to Kantor's proposal, and Bitsblockchain opened what they referred to as an "account" for the customer which was credited with a specified quantity of ATMC. 7. Former Blue Bit customers could access their new Bitsblockchain statements online.  Although their holdings of ATMC initially showed tremendous gains, these customers recently have been locked out of their Bitsblockchain accounts, and at least one customer is unable to withdraw and monetize his ATMC holdings.

8.     By virtue of this conduct and further conduct described below, the Defendants have engaged, are engaging, or are about to engage, in acts and practices in violation of the following sections of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and accompanying regulations ("Regulations"), 17 C.F.R. pt. 1.1-190.10 (2017):

   a.   Section 2(e) of the Act, 7 U.S.C. § 2(e) (2012), which prohibits off-exchange retail transactions in swaps;

   b.   Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 32.2, 17 C.F.R. § 32.2 (2017), which prohibit offering or entering into off-exchange transactions in commodity options;

   c.   Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012), which prohibits soliciting or accepting orders, and accepting money, for commodity options or swap transactions without registration as a futures commission merchant ("FCM");

   d.   Section 4c(b) of the Act and Regulation 32.4, 17 C.F.R. § 32.4 (2017), which prohibit fraud in connection with commodity options transactions; and

   e.   Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), which prohibit fraud in connection with, among other things, swap transactions.

3

9.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel Defendants' compliance with the Act and Regulations, and to further enjoin Defendants from engaging in certain commodity options and swaps-related activities.

10.     In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

11.     Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

13.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act because Defendants are found in, inhabit, or transact business in the Eastern District of New York, and the acts and practices in violation of the Act and Regulations have occurred within this District, among other places.

### III.    THE PARTIES

14.      Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission") is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act and regulations promulgated thereunder.

15.      Defendant Blake Harrison Kantor is a natural person, 42 years of age, who sometimes uses the alias name "Bill Gordon" and resides in New York, New York.  Kantor was registered as a broker with the Financial Industry Regulatory Authority until November 9, 2004, when his registration was terminated after he was convicted of a felony drug charge in 2002. Kantor has never been registered with the Commission in any capacity.

16.      Defendant Nathan Mullins is a natural person, 32 years of age and resides in Forest Hills, New York.  Mullins has never been registered with the Commission in any capacity.

17.      Defendant Blue Bit Banc is a business entity that purports, on its website, to be owned and operated by Biz-E-Bee Services, Ltd. in the U.K.  Blue Bit's website at www.bluebitbanc.com was created on April 28, 2014 and its registrant is Bill Gordon. Thereafter, a set of the incorporation documents for "Biz-E-Bee Services, Ltd.," originating from an Israeli firm, were sent to Bill Gordon on May 1, 2015.  Blue Bit has never been registered with the Commission in any capacity.

18.      Defendant Blue Bit Analytics, Ltd. is a business entity that appears to be located in Nevis, Turks and Caicos.  However, Analytics maintained an office in New York, NY from at least July 2015 through January 2017 and Bill Gordon was its "Managing Director."  Analytics maintained a bank account in Nevis, and, was the entity that accepted nearly all money from customers in connection with the swaps and virtual currency transactions at issue.  Analytics has never been registered with the Commission in any capacity.

19.     Defendant Mercury Cove, Inc. is a New York corporation incorporated on February 25, 2015 with its principal business office located at Mullins' residence.  Mullins was the incorporator of Mercury.  Mercury has never been registered with the Commission in any capacity.

20.     Defendant G. Thomas Client Services is a New York corporation incorporated on July 28, 2015.  G. Thomas has never been registered with the Commission in any capacity.

21.     Kantor, Mullins, Blue Bit, Analytics, Mercury Cove and G. Thomas have operated and functioned as a common enterprise–the Blue Bit Enterprise while engaging in the unlawful acts and practices alleged in this Complaint.  These defendants conducted business through an interrelated network of companies that have common control, business functions, employees, agents, and, for a time, shared office space.  Because these defendants have operated a common enterprise, they are jointly and severally liable for the unlawful acts and practices alleged in this Complaint.

22.     Relief Defendant Blue Wolf Sales Consultants is a New York corporation incorporated on May 20, 2014.  Kantor is the CEO of Blue Wolf.  Blue Wolf has never been registered with the Commission in any capacity.

## IV.     STATUTORY BACKGROUND

### A.     Prohibition Against Off-Exchange Retail Swaps and Options Trading

#### i.     Swaps

23.     An eligible contract participant ("ECP") is defined in Section 11a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual

enters into the transaction to manage the risk associated with an asset or liability incurred, or reasonably likely to be owned or incurred, by the individual.

24.     Section 2(e) of the Act, 7 U.S.C. § 2(e) (2012), makes it unlawful for any person who is not an ECP–i.e., any person who is a retail customer–to enter into a swap unless the swap is entered into on or subject to the rules of, a board of trade designated as a contract market under section 5" (hereafter referred to as "registered exchange)."

25.     Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A)(2012), defines "swap" to include, among other things, any agreement, contract, or transaction that:  (a) is an option of any kind; (b) provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency; or (c) provides on an executory basis for payments based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, without also conveying an ownership interest in any asset or liability.

### ii.      Options

26.     Through Section 4c(b) of the Act ,7 U.S.C. § 6c(b) (2012), Congress has given the Commission jurisdiction and plenary rulemaking authority over all commodity option transactions.

27.     The Act bans off-exchange trading of commodity option contracts under Section 4c(b) of the Act and Commission Regulation 32.2, 17 C.F.R. § 32.2 (2017).  Section 4c(b) of the Act makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known as, inter alia, an "option," "bid," "offer," "put," or "call," contrary to

any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

28.     Regulation 32.2 makes it unlawful for any person to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity options transaction, unless such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any swap.

**B.     Prohibition Against Unregistered FCMs**

29.     Section 4d(a)(1) of the Act, 7 U.S.C. §6d(a)(1) (2012), makes it unlawful for any person to act as an FCM unless such person is registered with the Commission.

30.     Section 1a(28)(A) of the Act, 7 U.S.C. § 1a(28)(A) (2012), defines an FCM as an individual, association, partnership, or trust that is engaged in soliciting or accepting orders for swaps or commodity options, and, in connection with soliciting or accepting such orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades that result or may result therefrom.

**C.     Prohibition Against Fraud**

31.     The Act and Regulations contains numerous anti-fraud provisions applicable to various categories of entities or transactions.

**i.     Options Fraud**

32.     Regulation 32.2, 17 C.F.R. § 32.2 (2017), states:

Subject to §§ 32.1, 32.4, and 32.5, which shall in any event apply to all commodity options transactions, it shall be unlawful for any person or group of persons to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction, unless:

(a) Such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any other swap, or
(b) Such transaction is conducted pursuant to § 32.3.

Furthermore, Regulation 32.4, 17 C.F.R. § 32.4 (2017), promulgated under Section 4c(b) of the

Act, provides that:

In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, directly or indirectly:
(a) To cheat or defraud or attempt to cheat or defraud any other person;
(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or
(c) To deceive or attempt to deceive any other person by any means whatsoever."

### ii.        Manipulative & Deceptive Devices in Connection with Swaps

33.        Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any

person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with

any swap, or a contract of sale of any commodity in interstate commerce . . . any manipulative or

deceptive device or contrivance, in contravention of such rules and regulations as the

Commission shall promulgate.

34        Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), in turn, specifically provides

that "it shall be unlawful for any person, directly or indirectly, in connection with any swap, or

contract of sale of any commodity in interstate commerce . . . on or subject to the rules of any

registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ,

any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any

untrue or misleading statement of a material fact or to omit to state a material fact necessary in

order to make the statements made not untrue or misleading; or (3) Engage, or attempt to

engage, in any act, practice, or course of business, which operates or would operate as a fraud or

deceit upon any person . . . ."

# V.      FACTS

## A.      Binary Options Generally

35.      Binary options are options that either pay nothing or a pre-determined payout depending upon the investor's prediction as to whether the price of the referenced asset (such as the price of gold or silver) will rise above or below a specified amount on a specified date and time.  The payout depends entirely on the outcome of this type of yes/no proposition.  For example, the yes/no proposition might be whether the price of silver will be higher than $33.40 per ounce at 11:17 a.m. on a particular day.

36.      Once the option holder acquires a binary option through payment of a premium, there is no further decision for the holder to make as to whether or not to exercise the binary option because binary options exercise automatically.  Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset–instead, it is "cash settled."  When the binary option expires, the option holder is entitled to a pre-determined amount of money if the customer has made a correct prediction.  If the customer has made an incorrect prediction, he or she gets nothing and loses the premium paid.

37.      Binary options contracts are required to be traded on a registered board of trade. There are only three designated contract markets currently authorized to offer binary options that are commodity options transactions to retail customers in the U.S.: Cantor Exchange LP, Chicago Mercantile Exchange, Inc., and the North American Derivatives Exchange, Inc.  All other entities offering binary options in the U.S. or to U.S. customers are doing so illegally.

38.      The Defendants are not ECPs and Blue Bit's customers are generally not ECPs. In fact, there is nothing on the Blue Bit website nor in its procedures for accepting new Blue Bit customers that qualifies prospective customers' income or net worth.

10

**B.    Virtual Currency and ATMC**

39.    "Virtual currency" is defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction. The virtual currency relevant to this complaint, ATM Coin, and other virtual currencies such as Bitcoin are distinct from "real" currencies, which are the coin and paper money of the United States or currencies of other countries that are issued, designated and circulated as legal tender, and customarily used and accepted as a medium of exchange.

40.    The virtual currency involved in this fraudulent scheme is ATM Coin or "ATMC" and stands for "Asset Trading Market Coin" According to its website at atmcoin.com, ATMC purports to be a "cryptocurrency" that is a "virtual currency that works essentially the same as the money you already know: to exchange goods and services." The website also states that ATMC uses open-source (meaning "everyone can access it") blockchain technology that is "decentralized" with "no government or authority to control it." However, ATMC also recently claimed to have become a "supranational legal tender currency" for a purported sovereignty called the "Principality of Saint Stephen."

**C.    Defendants' Illegal Binary Options Business**

41.    In at least April 2014, Blue Bit Banc began offering trading in binary options to U.S. retail customers.

42.    Using his alias name Bill Gordon, Kantor launched the website www.bluebitbanc.com ("Blue Bit Website"), which is also a registered domain name of Analytics. The Blue Bit Website, which is still online, claims that Blue Bit is "a premier option trading platform" and introduces investors "to the exciting world of exotic option trading by

creating an exceptional trading environment where anyone can trade binary options in a simple, smart way."

43.     Kantor consistently used his alias name Bill Gordon in all of his dealings with Blue Bit customers and used the Blue Bit Website to solicit investors to trade binary options by opening an account at Blue Bit.

44.     In February 2015, Mullins incorporated Mercury and opened a U.S. bank account for Mercury.  Mullins used Mercury to funnel payments it received from Analytics to the Blue Bit sales staff, to himself and to Kantor, through his company, Blue Wolf.

45.     In July 2015, Kantor, on behalf of Analytics, opened an office in midtown Manhattan to provide a venue for the Blue Bit sales staff to market binary options trading accounts at Blue Bit.  From 2015 through early 2017, at least twenty individuals worked for Blue Bit at various times in the Analytics sales office.

46.     G. Thomas was used to funnel payments it received from Analytics to the Blue Bit sales staff, and to Kantor, through his company, Blue Wolf.

**D.     Defendants Misappropriated Customer Funds**

47.     After convincing a prospective customer to open a Blue Bit trading account, Kantor and others acting on behalf of the Blue Bit Enterprise would instruct them how to fund their new account.  Kantor set up Analytics with an off-shore bank account.  Customers typically were told to send their funds by wire or credit card to Analytics at its Nevis bank account. Defendants received at least $618,810 in customer funds, most of which was sent to Analytics at its Nevis bank account.

48.     Analytics in turn sent customer funds from its Nevis bank account to Mercury and G. Thomas bank accounts in the U.S.  Those funds were then distributed to Mullins and the Blue Bit sales staff and were used to pay Defendants' business and personal expenses, including,

12

among others, salaries and commissions to sales staff.  The Mercury and G. Thomas bank accounts were used to further disguise how Blue Bit customer funds were being used.

49.     In at least one instance, Kantor, using his alias Bill Gordon, told a customer to send the funds which he intended for investment at Blue Bit to the G. Thomas U.S. bank account.  Kantor used this customer's $60,000 investment to pay Defendants' business and personal expenses.

50.     G. Thomas also transferred at least $62,710 to a Blue Wolf U.S. bank account and Mercury transferred $33,933 to the same Blue Wolf U.S. bank account.  Kantor is the sole signatory on the Blue Wolf account and used the account as his personal bank account.  Blue Wolf does not provide any legitimate services to Defendants' customers nor does it have any legitimate interest or entitlement to those customer funds.

51.     Kantor or individuals acting on behalf of the Blue Bit Enterprise made purported binary options trades for the customers or the customers were instructed by Kantor and others acting on behalf of the Blue Bit Enterprise on how to enter orders through the Blue Bit online order-entry platform on the Blue Bit website.  The Defendants then manipulated or fabricated purported trades in their customers' accounts to insure that they could be manipulated to the customers' disadvantage.  In some instances, trading losses continued until the customer's online account was nearly depleted.

52.     Some customers with balances reflected in their Blue Bit accounts have been unable to withdraw their funds.  Kantor told at least one customer that the customer's remaining balance was "bonus" money that had been credited to him by Blue Bit and, thus, were not his funds to withdraw.  In another situation, a customer has been unable to navigate the withdrawal of his money through Blue Bit's online account.

53.     In or around October 2017, as part of an exit strategy, the Defendants began to migrate their fraudulent business model away from binary options into a new fraudulent scheme in an effort to conceal the Blue Bit fraud.  Kantor contacted at least two Blue Bit customers who had large account balances and told them that he was getting out of the binary options business. Kantor told these customers that he had selected them because they were among his top 21 Blue Bit customers and that he, therefore, recommended that they authorize him to transfer at least part of their Blue Bit account balances to another company with which he had recently become affiliated.

54.     Kantor said that the new company was called Bitsblockchain and that it offered customers the chance to purchase its new virtual currency called ATMC.  Bitsblockchain offered ATMC for sale to retail customers via its website www.bitsblockchain.com.  Kantor and others acting on behalf of the Blue Bit Enterprise also marketed Bitsblockchain's ATMC to the public, including, for instance, by adding a link to Bitsblockchain's website on the Blue Bit website.

55.     Kantor told these two customers that he would be able to get them a good deal on the ATMC virtual currency because he was introducing a group of 21 customers to the firm. Kantor told his customers that they would receive ATMC with a value in U.S. dollars that would be far more than the U.S. dollars in their Blue Bit account, and told at least one customer that this arrangement meant that he had gotten a "HUGE deal."  Kantor also encouraged these customers to add additional funds to obtain even more ATMC.

56.     Some customers agreed to move their funds and at least one also sent additional money to Blue Bit to buy more ATMC.  Kantor told them that he transferred their Blue Bit account balances to Bitsblockchain for ATMC.  In doing so, Kantor, knowingly, or at the very least, acted recklessly in exchanging his former customers' Blue Bit account balances for the

ATMC virtual currency that he knew, or should have known, could not be monetized for anything close to the U.S. dollars that he had told his customers would be the case.

57.     After the Blue Bit customers were transferred to Bitsblockchain they could no longer access their online Blue Bit account statements.  However, they were able to access online statements at www.bitsblockchain.com.  Two customers were told that their Blue Bit account balances of approximately $300,000 and $175,000 were transferred to Bitsblockchain.  Over the few months that they have had holdings of ATMC, these customers have seen each of their account balances increase to purported values of more than $2 million.

58.     At least one of these customers recently attempted unsuccessfully to withdraw funds from his Bitsblockchain account.  This customer saw his ATMC account decline from more than $2.9 million to $814,381 and had his account "blocked."  When he inquired why this had happened, a representative of Bitsblockchain told him that it was blocked because his account was "in a process of investigation."

**D.     Defendants' Fraudulent Solicitations**

59.     The Blue Bit Enterprise defrauded U.S. customers whom they had solicited to trade binary options by misrepresenting and omitting material information.  The misrepresentations made by the Defendants included telling customers that they could withdraw their investment funds at any time after their Blue Bit trading had reached a specified volume of activity.

60.     The Blue Bit Enterprise also defrauded its customers by claiming it had added "bonuses" to their accounts.  However, these purported capital additions were a device subsequently used by the Blue Bit Enterprise to deny customers' requests to withdraw their funds.  Among other things, the Blue Bit Enterprise contended that the effect of the added

"bonuses" was to increase the required minimum trading volume before customers could make a withdrawal.

61.     Blue Bit knew that these representations were false, or at the least, acted recklessly in making those representations, in that customers were precluded from withdrawing their Blue Bit investment funds despite reaching the original trading volume specified to them before these purported bonuses were added.

62.     Blue Bit further defrauded their customers by omitting from their customers' online Blue Bit account statements and verbal communications with their customers that their funds had been misappropriated.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count One:  Illegal Off-Exchange Retail Swaps
### Section 2(e) of the Act Against all Defendants

63.     The allegations set forth in paragraphs 1 through 62 are realleged and incorporated herein by reference.

64.     The binary options offered by the Defendants constituted swaps transactions. During the Relevant Period, the Defendants entered into swaps transactions with customers using the instrumentalities of interstate commerce.

65.     The Defendants, who themselves were not ECPs, did this with customers who were non-ECPs.

66.     The swaps transactions that the Defendants entered into were not executed on any registered exchange.

67.     The Defendants, by entering into swaps transactions with retail customers, have violated Section 2(e) of the Act, 7 U.S.C. § 2(e) (2012).

68.     Defendant Kantor is a controlling person of Blue Bit and Analytics and has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Blue Bit and Analytics constituting the violations set forth in Count One.  Accordingly, Kantor is liable for each and every violation of the Act committed by Blue Bit and Analytics, pursuant to Section 13(b) of the Act, 7 U.S.C. §13(b) (2012).

69.     Defendant Mullins is a controlling person of Mercury, and, has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Mercury constituting the violations set forth in Count One.  Accordingly, Mullins is liable for each and every violation of the Act committed by Mercury, pursuant to Section 13(b) of the Act.

70.     Blue Bit and Analytics are liable for the acts, omissions, or failures of Kantor, and any other agents, employees, or persons otherwise acting for them, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

71.     G. Thomas is liable for the acts, omissions, or failures of its agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act, and Regulation 1.2.

72.     Mercury is liable for the acts, omissions, or failures of Mullins, and any other agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act, and Regulation 1.2.

73.     Each member of the Blue Bit Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 2(e) of the Act committed by other members of the Blue Bit Enterprise.

74.     Each act of entering into an illegal, off-exchange retail swap is alleged as a separate and distinct violation of Section 2(e) of the Act.

**Count Two:  Illegal Off-Exchange Commodity Options**
**Section 4c(b) of the Act and Regulation 32.2 Against all Defendants**

75.     The allegations set forth in paragraphs 1 through 74 are re-alleged and incorporated herein by reference.

76.     During the Relevant Period, the Defendants offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to commodity options using the instrumentalities of interstate commerce.

78.     The commodity options that the Defendants offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered exchange nor had they sought registration as an exempt foreign exchange.

79.     The Defendants, by offering to enter into, entering into, confirming the execution of, maintaining a position in, or otherwise conducting activity related to commodity options, other than on a registered exchange, have violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 32.2, 17 C.F.R. § 32.2 (2017).

80.     Defendant Kantor is a controlling person of Blue Bit and Analytics and has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Blue Bit and Analytics constituting the violations set forth in Count Two.  Accordingly, Kantor is liable for each and every violation of the Act committed by Blue Bit and Analytics, pursuant to Section 13(b) of the Act.

81.     Defendant Mullins is a controlling person of Mercury and has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Mercury constituting the violations set forth in Count Two.  Accordingly, Mullins is liable for each and every violation of the Act committed by Mercury, pursuant to Section 13(b) of the Act.

18

82.     Blue Bit and Analytics are liable for the acts, omissions, or failures of Kantor, and any other agents, employees, or persons otherwise acting for them, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

83.     G. Thomas is liable for the acts, omissions, or failures of its agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act, and Regulation 1.2.

84.     Mercury is liable for the acts, omissions, or failures of Mullins, and any other agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act, and Regulation 1.2.

85.     Each member of the Blue Bit Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 4c(b) of the Act and Regulation 32.2 committed by other members of the Blue Bit Enterprise.

86.     Each act of offering to enter into, entering into, confirming the execution of, maintaining a position in, or otherwise conducting activity related to commodity options, other than on a registered exchange, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 32.2.

### Count Three:  Unregistered FCM
### Section 4d(a)(1) of the Act Against Analytics, G. Thomas and Kantor

87.     The allegations set forth in paragraphs 1 through 86 are re-alleged and incorporated herein by reference.

88.     During the Relevant Period, the Defendants were engaged in soliciting and accepting orders for commodity options or swaps using the instrumentalities of interstate commerce.

89.     During the Relevant Period, Analytics and G. Thomas accepted money to margin, guarantee, or secure trades or contracts resulting from commodity options or swaps transactions using the instrumentalities of interstate commerce.

90.     Neither Analytics nor G. Thomas has ever been registered with the Commission as an FCM.

91.     Analytics and G. Thomas, by soliciting or accepting orders for commodity options or swaps, and accepting money to margin, guarantee, or secure trades or contracts resulting from those commodity options or swaps without registration as an FCM, have violated Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(1) (2012).

92.     Defendant Kantor is a controlling person of Analytics and has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Analytics constituting the violations as set forth in Count Three.  Accordingly, Kantor is liable for each and every violation of the Act committed by Analytics, pursuant to Section 13(b) of the Act.

94.     Analytics is liable for the acts, omissions, or failures of Kantor, and any other agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act, and Regulation 1.2.

95.     G. Thomas is liable for the acts, omissions, or failures of its agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

**Count Four:  Options Fraud**
**Section 4c(b) of the Act and Regulation 32.4 Against all Defendants**

96.     The allegations set forth in paragraphs 1 through 95 are re-alleged and incorporated herein by reference.

97.     During the Relevant Period, the Defendants, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option

transaction, using the instrumentalities of interstate commerce, directly and indirectly: (a) cheated or defrauded, and attempted or cheat and defraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c) deceived or attempted to deceive customers and prospective customers, in violation of Section 4c(b) of the Act and Regulation 32.4, 17 C.F.R. § 32.4 (2017).

98.     Defendant Kantor is a controlling person of Blue Bit and Analytics and has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Blue Bit and Analytics constituting the violations set forth in Count Four.  Accordingly, Kantor is liable for each and every violation of the Act committed by Blue Bit and Analytics pursuant to Section 13(b) of the Act.

100.    Defendant Mullins is a controlling person of Mercury and has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Mercury constituting the violations set forth in Count Four.  Accordingly, Mullins is liable for each and every violation of the Act committed by Mercury, pursuant to Section 13(b) of the Act.

101.    Blue Bit and Analytics are liable for the acts, omissions, or failures of Kantor, and any other agents, employees, or persons otherwise acting for them, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

102.    G. Thomas is liable for the acts, omissions, or failures of its agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

103.    Mercury is liable for the acts, omissions, or failures of Mullins, and any other agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

104.    Each member of the Blue Bit Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 4c(b) of the Act and Regulation 32.4 committed by other members of the Blue Bit Enterprise.

105.    Each act of: (a) cheating or defrauding, and attempting to cheat and defraud, customers and prospective customers; (b) making or causing to be made to customers and prospective customers false reports or statements; and (c) deceiving or attempting to deceive customers and prospective customers, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 32.4.

**Count Five:  Manipulative & Deceptive Devices in Connection with Swaps
Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)
Against all Defendants**

106.    The allegations set forth in paragraphs 1 through 105 are re-alleged and incorporated herein by reference.

107.    During the Relevant Period, the Defendants, intentionally or recklessly, using the instrumentalities of interstate commerce, directly and indirectly, in connection with swaps: (a) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (b) made, or attempted to make, untrue or misleading statements of material facts; (c) omitted to state material facts necessary in order to make statements made not untrue or misleading; and (d) engaged, or attempted to engage, in acts, practices, and courses of business, which operated or would operate as a fraud or deceit upon customers or prospective customers, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

22

108.    Defendant Kantor is a controlling person of Blue Bit and Analytics and has failed to act in good faith, or has knowingly induced, directly or indirectly, the acts of Blue Bit and Analytics constituting the violations as set forth in Count Five.  Accordingly, Kantor is liable for each and every violation of the Act committed by Blue Bit and Analytics pursuant to Section 13(b) of the Act.

109.    Blue Bit and Analytics are liable for the acts, omissions, or failures of Kantor, and any other agents, employees, or persons otherwise acting for them, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

110.    G. Thomas is liable for the acts, omissions, or failures of its agents, employees, or persons otherwise acting for it, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

111.    Each member of the Blue Bit Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 6(c)(1) of the Act and Regulation 180.1(a) committed by other members of the Blue Bit Enterprise.

112.    Each act of: (a) using or employing, or attempting to use or employ, manipulative devices, schemes, and artifices to defraud; (b) making, or attempting to make, untrue or misleading statements of material facts; (c) omitting to state material facts necessary in order to make statements made not untrue or misleading; and (d) engaging or attempting to engage, in acts, practices, and courses of business, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to the Court's own equitable powers, enter:

a.  An order finding that the Defendants violated Sections 2(e), 4c(b), and 6(c)(1) of the Act, 7 U.S.C. §§ 2(e), 6c(b), 9(1) (2012), and Regulations 32.2, 32.4, and 180.1(a), 17 C.F.R. §§ 32.2, 32.4, 180.1(a) (2017);

b.  An order finding that Defendants Kantor, Analytics and G. Thomas violated Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012);

c.  An order of permanent injunction prohibiting the respective Defendants and any other person or entity associated with them, from engaging in the conduct described above, in violation of Sections 2(e), 4c(b), 4d(1), and 6(c)(1) of the Act and Regulations 32.2, 32.4 and 180.1(a);

d.  An order of permanent injunction prohibiting the Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with Defendants, including any successor thereof, from directly or indirectly:

   i.   Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

   ii.  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3 (yy), 17 C.F.R. § 1.3(yy) (2017)) for Defendants' own personal accounts or for any accounts in which Defendants have a direct or indirect interest;

   iii. Having any commodity interests traded on Defendants' behalf;

      iv.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

      v.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

      vi.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

      vii.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9).

e.    An order directing Defendants and Relief Defendant, as well as any successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and the Regulations, including pre- and post-judgment interest;

f.    An order directing Defendants, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused

another person or entity to receive as a result of acts and practices that constituted violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

g.    An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1)(2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, see Commission Regulation 143.8, 17 C.F.R. § 143.8 (2017) for each violation of the Act, as described herein;

h.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

i.    Enter an Order providing such other and further relief as this Court may deem necessary and appropriate.

Date:  April ___, 2018

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING COMMISSION

/s/ Susan B. Padove
Lead Attorney, *pro hac vice*
Susan B. Padove
Senior Trial Attorney
(312) 596-0544
spadove@cftc.gov

David Terrell, *pro hac vice*
Chief Trial Attorney
(312)596-0539

dterrell@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
525 W. Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0700 (Office Number)
(312) 596-0714 (facsimile)