IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Commodity Futures Trading Commission,

        Plaintiff,

        v.

Blake Harrison Kantor aka Bill Gordon,
Nathan Mullins,
Blue Bit Banc,
Blue Bit Analytics, Ltd.,
G. Thomas Client Services, and
Mercury Cove, Inc.,

        Defendants,

and

Blue Wolf Sales Consultants,

        Relief Defendant.

Civil Action No. 18-cv-2247-SJF-ARL

## ████████ ORDER FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF

### I. INTRODUCTION

On April 16, 2018, the Commodity Futures Trading Commission ("Commission,"

"CFTC" or "Plaintiff") filed a Complaint charging Defendants Blake Harrison Kantor aka Bill

Gordon ("Kantor"), Nathan Mullins ("Mullins"), Blue Bit Banc ("Blue Bit"), Blue Bit Analytics,

Ltd. ("Analytics"), G. Thomas Client Services ("G. Thomas") and Mercury Cove, Inc.

("Mercury Cove") (collectively "Defendants") with violating Sections 2(e), 4c(b), 4d(a)(1) and

Section 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 2(e), 6c(b), 6d(a)(1) and

9(1) (2012), and Commission Regulations ("Regulations") 32.2, 32.4 and 180.1(a), 17 C.F.R.

§§ 32.2, 32.4 and 180.1(a) (2017).

In addition, the Complaint claimed that Relief Defendant, Blue Wolf Sales Consultants ("Blue Wolf"), who was not charged with violations of the Act or Regulations, received funds and assets from Defendants, to which Relief Defendant held no legitimate interest or entitlement and which were derived from Defendants' fraudulent and violative acts.

On April 19, 2018, Defendant Kantor was properly served with the summons and Complaint pursuant to Rule 4(e)(2)(A) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") by personally delivering a copy to Kantor. On April 19, 2018, Defendants Blue Bit, Analytics and Relief Defendant, Blue Wolf, were properly served with the summons and Complaint pursuant to Rule 4(h)(1) of the Fed. R. Civ. P. by personal service upon their officer and agent, Kantor. On April 20, 2018, Defendant Mullins was properly served with the summons and Complaint pursuant to Rule 4(e)(2)(A) of the Fed. R. Civ. P. by personally delivering a copy to Mullins. On April 20, 2018, Defendant Mercury Cove was properly served with the summons and Complaint pursuant to Rule 4(h)(1) of the Fed. R Civ. P. by personal service upon its officer and agent, Mullins. On April 20, 2018, Defendant G. Thomas was properly served with the summons and Complaint pursuant to Rule 4(h)(1) of the Fed. R. Civ. P. by personal service upon its officer and agent, Glenn Olson, through his attorney, Michael Nedick, Esq., who agreed to accept service for G. Thomas.

On April 17, 2018, the Court entered a Statutory Restraining order and on May 2, 2018 it entered a Preliminary Injunction against Defendants and Relief Defendant that, among other things, authorized the freezing of assets held in the name of, or under the control or management of, the Defendants and/or Relief Defendant.

Defendants and Relief Defendant have failed to appear or answer the Complaint within the time permitted by Fed. R. Civ. P. 12(a)(1). Accordingly, the Commission filed motions for entry of a clerk's default against Defendants and Relief Defendant and on June 13, 2019, the Clerk of this Court entered a default against Defendants and Relief Defendant.

The Commission has moved this Court to grant final judgment by default against Defendants, order permanent injunctive relief, and impose a restitution obligation, disgorgement obligation and civil monetary penalty. The Commission has further moved this Court to grant final judgment by default against Relief Defendant and order disgorgement of ill-gotten funds to which it is not entitled.

The Court has carefully considered the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's memorandum in support of its motion, the Declarations of Joseph Patrick, the record in this case, and the Court being otherwise advised in the premises, it is hereby:

**ORDERED** that the Plaintiff's Motion for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief against Defendants and Relief Defendant is **GRANTED.** Accordingly, the Court enters findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief ("Order") pursuant to Sections 6c and 6d of the Act, 7 U.S.C. § 13a-1 (2012), as set forth herein.

## II. FINDINGS OF FACT

A.    **The Parties**

1.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act,

3

7 U.S.C. §§ 1–26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2018). [Comp. ¶ 14]

2.      Defendant **Blake Harrison Kantor** is a natural person, 44 years of age, who sometimes uses the alias "Bill Gordon" and currently resides in Fort Lee, New Jersey. Kantor was registered with the Financial Industry Regulatory Authority ("FINRA") until 2004, when he was terminated following a felony conviction. Kantor has never been registered with the Commission in any capacity. [Comp. ¶ 15]

3.      Defendant **Nathan Mullins** is a natural person, 34 years of age and currently resides in Astoria, New York. Mullins has never been registered with the Commission in any capacity. [Comp. ¶ 16]

4.      Defendant **Blue Bit Banc** is a business entity that purports to be owned and operated by Biz-E-Bee Services, Ltd. in the U.K. Blue Bit's website at www.bluebitbanc.com was created on April 28, 2014, and its registrant is "Bill Gordon," and its registrant organization is Analytics. Blue Bit has never been registered with the Commission in any capacity. [Comp. ¶ 17]

5.      Defendant **Blue Bit Analytics, Ltd.** is a business entity that appears to be located in Nevis, Turks and Caicos. However, Analytics had an office location in New York, NY from at least July 2015 through January 2017. "Bill Gordon" was the "Managing Director" of Analytics. Analytics has never been registered with the Commission in any capacity. [Comp. ¶ 18]

6.      Defendant **G. Thomas Client Services** is located in Brooklyn, New York and organized on July 28, 2015. G. Thomas has never been registered with the Commission in any capacity. [Comp. ¶ 20]

7. Defendant **Mercury Cove, Inc.** is a corporation organized in New York in February 2015 and located in Forest Hills, New York. Mullins is the incorporator and sole shareholder of Mercury Cove. Mullins submitted documents to open a business banking account in the name of Mercury Cove and listed himself as the owner of Mercury Cove. Mercury has never been registered with the Commission in any capacity. [Comp. ¶ 19]

8. Defendants Kantor, Mullins, Blue Bit, Analytics, Mercury and G. Thomas operated and functioned as a common enterprise, hereafter referred to as the "Blue Bit Enterprise." [Comp. ¶ 21]

**Relief Defendant**

9. Relief Defendant **Blue Wolf Sales Consultants** is a New York corporation incorporated on May 20, 2014. Kantor is the CEO of Blue Wolf. Blue Wolf has never been registered with the Commission in any capacity. [Comp. ¶ 22]

**B. Defendants' Illegal Binary Options Business**

10. In at least April 2014, Blue Bit Banc began offering trading in binary options to U.S. retail customers. [Comp. ¶ 41]

11. Using his alias name Bill Gordon, Kantor launched the website www.bluebitbanc.com ("Blue Bit Website"), which is also a registered domain name of Analytics. The Blue Bit Website, which was still online as of the filing date of Plaintiff's lawsuit, claimed that Blue Bit is "a premier option trading platform" and introduces investors "to the exciting world of exotic option trading by creating an exceptional trading environment where anyone can trade binary options in a simple, smart way." [Comp. ¶ 42]

12. Kantor consistently used his alias name Bill Gordon in all of his dealings with Blue Bit customers and used the Blue Bit Website to solicit investors to trade binary options by opening an account at Blue Bit. [Comp. ¶ 43]

5

13.     In February 2015, Mullins incorporated Mercury and opened a U.S. bank account for Mercury. Mullins used Mercury to funnel payments it received from Analytics to the Blue Bit sales staff, to himself and to Kantor, through his company, Blue Wolf. [Comp. ¶ 44]

14.     In July 2015, Kantor, on behalf of Analytics, opened an office in midtown Manhattan to provide a venue for the Blue Bit sales staff to market binary options trading accounts at Blue Bit. From 2015 through early 2017, at least twenty individuals worked for Blue Bit at various times in the Analytics sales office. [Comp. ¶ 45]

15.     G. Thomas was used to funnel payments it received from Analytics to the Blue Bit sales staff, and to Kantor, through his company, Blue Wolf. [Comp. ¶ 46]

## C.     Defendants Misappropriated Customer Funds

16.     After convincing a prospective customer to open a Blue Bit trading account, Kantor and others acting on behalf of the Blue Bit Enterprise would instruct them how to fund their new account. Kantor set up Analytics with an off-shore bank account. Customers typically were told to send their funds by wire or credit card to Analytics at its Nevis bank account. Defendants received at least $846,405.58 in customer funds, most of which was sent to Analytics at its Nevis bank account. [Comp. ¶ 47]

17.     Analytics in turn sent customer funds from its Nevis bank account to Mercury and G. Thomas bank accounts in the U.S. Those funds were then distributed to Mullins and the Blue Bit sales staff and were used to pay Defendants' business and personal expenses, including, among others, salaries and commissions to sales staff. The Mercury and G. Thomas bank accounts were used to further disguise how Blue Bit customer funds were being used. [Comp. ¶ 48]

18.     In at least one instance, Kantor, using his alias Bill Gordon, told a customer to send the funds which he intended for investment at Blue Bit to the G. Thomas U.S. bank

account. Kantor used this customer's $60,000 investment to pay Defendants' business and personal expenses. [Comp. ¶ 49]

19. G. Thomas also transferred $60,638.20 to a Blue Wolf U.S. bank account and Mercury transferred $28,070.84 to the same Blue Wolf U.S. bank account. Kantor is the sole signatory on the Blue Wolf account and used the account as his personal bank account. Blue Wolf does not provide any legitimate services to Defendants' customers nor does it have any legitimate interest or entitlement to those customer funds. [Comp. ¶ 50]

20. Kantor or individuals acting on behalf of the Blue Bit Enterprise made purported binary options trades for the customers or the customers were instructed by Kantor and others acting on behalf of the Blue Bit Enterprise on how to enter orders through the Blue Bit online order-entry platform on the Blue Bit website. The Defendants then manipulated or fabricated purported trades in their customers' accounts to insure that they could be manipulated to the customers' disadvantage. In some instances, trading losses continued until the customer's online account was nearly depleted. [Comp. ¶ 51]

21. Some customers with balances reflected in their Blue Bit accounts have been unable to withdraw their funds. Kantor told at least one customer that the customer's remaining balance was "bonus" money that had been credited to him by Blue Bit and, thus, were not his funds to withdraw. At least one other customer has been unable to navigate the withdrawal of his money through Blue Bit's online account. [Comp. ¶ 52]

22. In or around October 2017, as part of an exit strategy, the Defendants began to migrate their fraudulent business model away from binary options into a new fraudulent scheme in an effort to conceal the Blue Bit fraud. Kantor contacted at least two Blue Bit customers who had large account balances and told them that he was getting out of the binary options business.

Kantor told these customers that he had selected them because they were among his top 21 Blue Bit customers and that he, therefore, recommended that they authorize him to transfer at least part of their Blue Bit account balances to another company with which he had recently become affiliated. [Comp. ¶ 53]

23. Kantor said that the new company was called Bitsblockchain and that it offered customers the chance to purchase its new virtual currency called ATMC, or "ATM Coin" or "Asset Trading Market Coin." ATMC purported to be a cryptocurrency utilizing open-source blockchain technology with no government authority controlling it, although it also claimed on its website, www.bitsblockchain.com, to be a "supranational legal tender currency" for a purported sovereignty called the "Principality of Saint Stephen." Bitsblockchain offered ATMC for sale to retail customers via its website. Kantor and others acting on behalf of the Blue Bit Enterprise also marketed Bitsblockchain's ATMC to the public, including, for instance, by adding a link to Bitsblockchain's website on the Blue Bit website. [Comp. ¶ 54]

24. Kantor told these two customers that he would be able to get them a good deal on the ATMC virtual currency because he was introducing a group of 21 customers to the firm. Kantor told his customers that they would receive ATMC with a value in U.S. dollars that would be far more than the U.S. dollars in their Blue Bit account, and told at least one customer that this arrangement meant that he had gotten a "HUGE deal." Kantor also encouraged these customers to add additional funds to obtain even more ATMC. [Comp. ¶ 55]

25. Some customers agreed to move their funds and at least one also sent additional money to Blue Bit to buy more ATMC. Kantor told them that he transferred their Blue Bit account balances to Bitsblockchain for ATMC. In doing so, Kantor, knowingly, or at the very least, acted recklessly in exchanging his former customers' Blue Bit account balances for the

8

ATMC virtual currency that he knew, or should have known, could not be monetized for anything close to the U.S. dollars that he had told his customers would be the case. [Comp. ¶ 56]

26.     After the Blue Bit customers were transferred to Bitsblockchain they could no longer access their online Blue Bit account statements. However, they were able to access online statements at www.bitsblockchain.com. Two customers were told that their Blue Bit account balances of approximately $300,000 and $175,000 were transferred to Bitsblockchain. In only a few months, customers who had holdings of ATMC saw their account balances increase to purported values of more than $2 million. [Comp. ¶ 57]

27.     At least one of these customers then attempted unsuccessfully to withdraw funds from his Bitsblockchain account. This customer saw his ATMC account decline from more than $2.9 million to $814,381 and had his account "blocked." When he inquired why this had happened, a representative of Bitsblockchain told him that it was blocked because his account was "in a process of investigation." That customer was never able to withdraw any funds from his ATMC account. [Comp. ¶ 58 and Patrick Supp. Dec. ¶ 13]

**D. Defendants' Fraudulent Solicitations**

28.     The Blue Bit Enterprise defrauded U.S. customers whom they had solicited to trade binary options by misrepresenting and omitting material information. The misrepresentations made by the Defendants included telling customers that they could withdraw their investment funds at any time after their Blue Bit trading had reached a specified volume of activity. [Comp. ¶ 59]

29.     The Blue Bit Enterprise also defrauded its customers by claiming it had added "bonuses" to their accounts. However, these purported capital additions were a device subsequently used by the Blue Bit Enterprise to deny customers' requests to withdraw their funds. Among other things, the Blue Bit Enterprise contended that the effect of the added

"bonuses" was to increase the required minimum trading volume before customers could make a withdrawal. [Comp. ¶ 60]

30.     Blue Bit knew that these representations were false, or at the least, acted recklessly in making those representations, in that customers were precluded from withdrawing their Blue Bit investment funds despite reaching the original trading volume specified to them before these purported bonuses were added. [Comp. ¶ 61]

31.     Blue Bit further defrauded their customers by omitting from their customers' online Blue Bit account statements and verbal communications with their customers that their funds had been misappropriated. [Comp. ¶ 62]

### III. Conclusions of Law

**A.     Jurisdiction and Venue**

1.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

2.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because the Defendants and Relief Defendant reside or transact business in this jurisdiction and the acts and practices in violation of the Act and Regulations occurred, are occurring or are about to occur within this District, among other places.

**B.    Illegal Off-Exchange Retail Swaps in Violation of Section 2(e) of the Act**

3.    An eligible contract participant ("ECP") is defined in Section 11a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A0(xi), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset or liability incurred, or reasonably likely to be owned or incurred, by the individual.

4.    Section 2(e) of the Act, 7 U.S.C. § 2(e)(2012), makes it unlawful for any person who is not an ECP – i.e., any person who is a retail customer – to enter into a swap unless the swap is entered into on or subject to the rules of, a board of trade designated as a contract market under section 5 (hereafter referred to as "registered exchange").

5.    By offering binary options to retail customers, Defendants, who were not ECPs, entered off-exchange swaps transactions to retail customers who were also not ECPs, in violation of Section 2(e) of the Act, 7 U.S.C. § 2(e) (2012).

**C.    Illegal Off-Exchange Commodity Options in Violation of Section 4c(b) of the Act and Regulation 32.2**

6.    Congress gave the Commission jurisdiction and plenary rulemaking authority over all commodity option transactions through Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012).  Section 4c(b) of the Act and Commission Regulation 32.2, 17 C.F.R. § 32.2 (2019) bans off-exchange trading of commodity option contracts and, specifically, makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known as, inter alia, an "option," "bid," "offer," "put," or "call," contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

7. Regulation 32.2 makes it unlawful for any person to offer enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity options transaction, unless such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any swap.

8. The Defendants entered into, confirmed the execution of, maintained a position in, or otherwise conducted activity related to commodity options, other than on a registered exchange and without seeking registration as an exempt foreign exchange, and thereby violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 32.2, 17 C.F.R. § 32.2 (2018).

**D. Unregistered FCM Activities in Violation of Section 4d(a)(1) of the Act**

9. Section 1a(28) of the Act, 7 U.S.C. § 1a(28) defines, in part, a futures commission merchant ("FCM") as an individual, association, partnership, corporation, or trust that is engaged in soliciting and accepting orders for commodity options or swaps using the instrumentalities of interstate commerce. Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), makes it unlawful for any person to act as an FCM unless such person is registered with the Commission.

10. Defendants Analytics and G. Thomas, who have never been registered in any capacity with the Commission, solicited or accepted orders for commodity options or swaps, and accepted money to margin, guarantee, or secure trades or contracts resulting from those commodity options or swaps without registration as an FCM, and thereby violated Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012).

**E. Options Fraud in Violation of Section 4c(b) of the Act and Regulation 32.4**

11. Regulation 32.4, 17 C.F.R. § 32.4 (2019), promulgated under Section 4c(b) of the Act, provides that:

In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, directly or indirectly:

    (a) To cheat or defraud or attempt to cheat or defraud any other person;

    (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or

    (c) To deceive or attempt to deceive any other person by any means whatsoever.

12.    The Defendants, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, using the instrumentalities of interstate commerce, directly and indirectly: (a) cheated or defrauded, and attempted to cheat and defraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c) deceived or attempted to deceive customers and prospective customers, in violation of Section 4c(b) of the Act and Regulation 32.4, 17 C.F.R. § 32.4 (2018).

**F.    Manipulative & Deceptive Devices in Connection with Swaps in Violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)**

13.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

14.    Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019), in turn, specifically provides that "it shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce . . . on or subject to the rules of any

registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person. . . ."

15.     The Defendants, intentionally or recklessly, using the instrumentalities of interstate commerce, directly and indirectly, in connection with swaps: (a) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (b) made, or attempted to make, untrue or misleading statements of material facts; (c) omitted to state material facts necessary in order to make statements made not untrue or misleading; and (d) engaged, or attempted to engage, in acts, practices, and courses of business, which operated or would operate as a fraud or deceit upon customers or prospective customers, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).

**G.      Kantor is Liable for the Violations of Blue Bit and Analytics and Mullins is Liable for the Violations of Mercury**

16.     Defendant Kantor controlled Blue Bit and Analytics, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Blue Bit's and Analytics' act or acts in violation of the Act and Regulations; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Kantor is liable for Blue Bit's and Analytics' violations of 7 U.S.C. §§ 2(e), 6c(b) and 9(1) and 17 C.F.R. §§ 32.2, 32.4 and 180.1 and Kantor is also liable for Analytics' violations of 7 U.S.C. § 6d(1).

17.     Defendant Mullins controlled Mercury, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Mercury's act or acts in violation of the Act and

Regulations; therefore, pursuant to 7 U.S.C. § 13c(b), Mullins is liable for Mercury's violations of 7 U.S.C. §§ 2(e) and 6c(b) and 17 C.F.R. §§ 32.2 and 32.4.

**H.     Blue Bit and Analytics are Liable for the Acts and Omissions of Kantor and Mercury Cove is Liable for the Acts and Omissions of Mullins**

18.     The acts, omissions, and failures of Defendant Kantor occurred within the scope of his employment, office, or agency with Blue Bit and Analytics; therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2018), Blue Bit and Analytics are liable for Kantor's acts, omissions, and failures in violation of 7 U.S.C. §§ 2(e), 6c(b) and 9(1) and 17 C.F.R. §§ 32.2, 32.4 and 180.1 and Analytics is also liable for Kantor's violations of 7 U.S.C. § 6d(1).

19.     The acts, omissions, and failures of Defendant Mullins occurred within the scope of his employment, office, or agency with Mercury; therefore, pursuant 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Mercury is liable for Mullins' acts, omissions, and failures in violation of 7 U.S.C. §§ 2(e), 6c(b) and 9(1) and 17 C.F.R. §§ 32.2, 32.4 and 180.1.

**I.     The Defendants Operated as a Common Enterprise**

20.     Each member of the Blue Bit Enterprise participated in the unlawful acts and practices and is therefore jointly and severally liable for the violations of Section 2(e) of the Act committed by other members of the Blue Bit Enterprise.

**J.     An Injunction is Necessary**

21.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants Kantor, Mullins, Blue Bit, Analytics, G. Thomas and Mercury will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## K.  Relief Defendant Blue Wolf Must Disgorge Ill-Gotten Funds

22.    The Court may grant equitable relief against a relief defendant if it is established

that the relief defendant possesses property or profits illegally obtained, and the relief defendant

has no legitimate claim to them.  *See SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)

("Federal courts may order equitable relief against a person who is not accused of wrongdoing in

a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does

not have a legitimate claim to those funds"); *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d

187, 192 n.4 (4th Cir. 2002) ("[I]t is entirely appropriate to allow the Commission to proceed

against nominal defendants under the same circumstances in which the SEC could proceed

against such defendants." (*citing SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)).  Relief

Defendant Blue Wolf has failed establish its entitlement to more than $463,097.25 in deposits it

received and is therefore required to disgorge that amount.

## IV. PERMANENT INJUNCTION

### IT IS HEREBY ORDERED THAT:

1.    Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), Defendants Kantor,

Mullins, Blue Bit, Analytics, G. Thomas and Mercury are permanently restrained, enjoined and

prohibited from directly or indirectly:

    a.    As a non-ECP, entering off-exchange swaps transactions by offering binary

        options to retail customers who are not ECPs, and thereby violating Section 2(e)

        of the Act, 7 U.S.C. § 2(e) (2012);

    b.    Entering into, confirming the execution of, maintaining a position in, or otherwise

        conducting activity related to commodity options, other than on a registered

        exchange and without seeking registration as an exempt foreign exchange, and

thereby violating Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and

Regulation 32.2, 17 C.F.R. § 32.2 (2018);

c. Soliciting or accepting orders for commodity options or swaps, and accepting

money to margin, guarantee, or secure trades or contracts resulting from those

commodity options or swaps without registration as an FCM, thereby violating

Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012);

d. In or in connection with an offer to enter into, the entry into, or the confirmation

of the execution of, any commodity option transaction, using the instrumentalities

of interstate commerce, directly and indirectly: (a) cheating or defrauding, and

attempting to cheat and defraud, customers and prospective customers;

(b) making or causing to be made to customers and prospective customers false

reports or statements; and (c) deceiving or attempting to deceive customers and

prospective customers, thereby violating Section 4c(b) of the Act and Regulation

32.4, 17 C.F.R. § 32.4 (2018);

e. Intentionally or recklessly, using the instrumentalities of interstate commerce,

directly and indirectly, in connection with swaps: (a) using or employing, or

attempting to use or employ, manipulative devices, schemes, and artifices to

defraud; (b) making, or attempting to make, untrue or misleading statements of

material facts; (c) omitting to state material facts necessary in order to make

statements made not untrue or misleading; and (d) engaging, or attempting to

engage, in acts, practices, and courses of business, which operate, or would

operate, as a fraud or deceit upon customers or prospective customers, in violation

of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).

2.      Defendants also permanently restrained, enjoined and prohibited from directly or indirectly:

a.      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

b.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)), for their own personal account or for any account in which they have a direct or indirect interest;

c.      Having any commodity interests traded on their behalf;

d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018); and/or

g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2018)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or

18

required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V.    RESTITUTION, DISGORGEMENT, AND CIVIL MONETARY PENALTY

### A.    Restitution

1.      Defendants Kantor, Mullins, Blue Bit, Analytics, G. Thomas and Mercury shall pay, jointly and severally, restitution in the amount of Eight-hundred and forty-six-thousand, four-hundred and five dollars and fifty-eight cents ($846,405.58) ("Restitution Obligation"). If the Restitution Obligation is not paid immediately, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012). Kantor is a defendant in *United States v. Blake Kantor*, (E.D.N.Y., Cr. No. 18-177 (SJF) ("Criminal Action") and the Court there set the amount of Restitution owed by Kantor to the same customers at $846,405.58. Kantor is obliged to first make restitution payments pursuant to the Order in the Criminal Action. For amounts disbursed to Defendant Kantor's customers as a result of satisfaction of the restitution ordered in the Criminal Action, the Defendants shall receive a dollar-for-dollar credit against the Restitution Obligation. Within ten days of disbursement in the Criminal Action to Defendant's customers, Defendant shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form of payment to those customers.

2.      To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, the Court appoints the National Futures

19

Association ("NFA") as Monitor ("Monitor"). The Monitor shall receive restitution payments from Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

3. Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Order to the Monitor in the name "Blue Bit Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

4. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part III. C. below.

5. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

6. The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

7. The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

8. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

9.    To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

## B.    Disgorgement

10.    Defendant Kantor shall pay disgorgement in the amount of Five-hundred and fifteen thousand, seven-hundred and fifty-nine dollars and eighty-five cents ($515,759.85) ("Kantor Disgorgement Obligation"); representing the gains he received in connection with his violations of the law. Kantor shares a portion of this Disgorgement Obligation, jointly and severally, with Relief Defendant Blue Wolf, specifically $463,097.25.    If the Kantor Disgorgement Obligation is not paid immediately, then post-judgment interest shall accrue on the Kantor Disgorgement Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

11.    Defendant Mullins shall pay disgorgement in the amount of Eighty-nine thousand, five-hundred and seventy-four dollars and forty-three cents ($89,574.43) (Mullins' Disgorgement Obligation), representing the gains he received in connection with his violations of the law. If the Mullins Disgorgement Obligation is not paid immediately, then post-judgment interest shall accrue on the Mullins Disgorgement Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

12.    Relief Defendant, Blue Wolf, shall pay disgorgement in the amount of Four-hundred sixty-three thousand and ninety-seven dollars and twenty-five cents ($463,097.25) (Blue Wolf Disgorgement Obligation), representing the gains it received and to which it has no legitimate entitlement. Blue Wolf shares its Disgorgement Obligation, jointly and severally,

with Defendant Kantor. If the Blue Wolf Disgorgement Obligation is not paid immediately, then post-judgment interest shall accrue on the Blue Wolf Disgorgement Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

13. Defendants shall pay their respective Disgorgement Obligations and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the Disgorgement Obligation with a cover letter that identifies Defendant and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

## C. Civil Monetary Penalty

14. Defendants Kantor, Blue Bit, Analytics, G. Thomas and Mercury, shall pay, jointly and severally, a civil monetary penalty in the amount of Two Million Five-Hundred

Thousand Dollars ($2,500,000) ("CMP Obligation"). If the CMP Obligation is not paid immediately, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

15. Defendant Mullins shall pay a civil monetary penalty in the amount of Three Hundred Thousand Dollars ($300,000) (Mullins' CMP Obligation"). If the Mullins' CMP Obligation is not paid immediately, then post-judgment interest shall accrue on the Mullins' CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

16. Defendants shall pay the CMP Obligation or the Mullins' CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation or Mullins' CMP

Obligation with a cover letter that identifies Defendant and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

## VI. MISCELLANEOUS PROVISIONS

### A.    Provisions Related to Monetary Sanctions

1.    Partial Satisfaction: Acceptance by the Commission/CFTC or the Monitor of any partial payment of Defendants' Restitution Obligation, Disgorgement Obligation, CMP Obligation or Mullins' CMP Obligation shall not be deemed a waiver their obligation to make further payments pursuant to this Order, or a waiver of the Commission/CFTC's right to seek to compel payment of any remaining balance.

2.    Asset Freeze: On April 17, 2018, the Court entered, and on May 2, 2018, the Court extended, an asset freeze order prohibiting the transfer, removal, dissipation and disposal of Defendants' and Relief Defendant's assets ("Asset Freeze Order"). The court hereby lifts the Asset Freeze Order.

3.    Notice: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

Scott R. Williamson
Acting Deputy Director of Enforcement
**CFTC Chicago Regional Office**
525 W Monroe Street, Suite 1100
Chicago, IL 60661

Notice to Defendants:

**Blake Kantor**
2200 N. Central Road
Apt. 8F
Fort Lee, NJ 07024

**Blue Bit Analytics, Ltd.**
c/o Blake Kantor
2200 N. Central Road
Apt. 8F
Fort Lee, NJ 07024

**Nathan Mullins**
c/o Scott Druker, Esq.
1325 Franklin Avenue, Suite 225
Garden City, New York 11530

**G. Thomas Client Services (c/o Glenn Olson)**
c/o Attorney Michael Nedick, Esq.
888 Grand Concourse
Bronx, NY 10451

**Blue Bit Banc**
c/o Blake Kantor
2200 N. Central Road
Apt. 8F
Fort Lee, NJ 07024

**Blue Wolf Sales Consultants**
c/o Blake Kantor
2200 N. Central Road
Apt. 8F
Fort Lee, NJ 07024

**Mercury Cove, Inc.**
c/o Nathan Mullins
30-59 47th Street
Rear Unit
Astoria, NY 11103

Notice to NFA:

Daniel Driscoll, Executive Vice President, COO
National Futures Association
300 S. Riverside Plaza, Suite 1800
Chicago, IL 60606-3447

All such notices to the Commission or the NFA shall reference the name and docket number of this action.

4.      Change of Address/Phone:  Until such time as Defendants and Relief Defendant satisfy in full their Restitution Obligation, Disgorgement Obligation, and CMP Obligation as set forth in this Order, Defendants and Relief Defendant shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

5.    Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

6.    Continuing Jurisdiction of this Court: ~~This Court shall retain jurisdiction of~~ this action to ensure compliance with ~~this Order~~ and for all other purposes related to this action, including ~~any motion by Defendants or Relief Defendant to modify or for relief from the terms of this Order.~~

7.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants and Relief Defendants, upon any person under the authority or control of any of the Defendants or Relief Defendant, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants or Relief Defendant.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Order for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalties and Other Statutory and Equitable Relief* forthwith and without further notice, and to close this case.

IT IS SO ORDERED on this 23rd day of October, 2019.

s/ Sandra J. Feuerstein
**The Honorable Sandra J. Feuerstein**
**UNITED STATES DISTRICT JUDGE**

27